May it please the court. I'm Clark Speaks and I represent the defendant Michael Rankins in this matter. The first issue in this case is whether the district court committed a reversible error when it interjected itself into the plea negotiations. Federal Rule of Criminal Procedure 11C1 says that the court must not participate in these plea negotiations. And there are three main reasons why. The main case in this area is United States v. Sanya. And the court wants to avoid coercion on the part of the district court judge, promote fairness, and eliminate the appearance of a judge advocating for a particular disposition. And so in this case there's a discussion between the judge and the prosecutor. Now the background of that discussion is that it's an intended arraignment. So the defendant has come into court. He's with his attorney. The prosecutor is there. The judge is up front. And the defendant has made a motion to have counsel replaced and to have new counsel. Now this is already the second lawyer. So there was an initial lawyer with the public defender's office. Now this is the second lawyer. The defendant is asking the court for another lawyer. The judge is in a little bit of a difficult spot here because he's trying to balance two very important issues. Judicial efficiency, judicial economy, and being responsible with government resources. Balancing that against the rights of the defendant to have an attorney who he can communicate with and to have a fair process for him. So the judge is trying to balance those things. And it's in this context where this conversation takes place. And the judge is speaking to the prosecutor and he says, and this is a charge of bank robbery. The idea is two people allegedly went into a bank and robbed it. The judge says to the prosecutor, the other guy pled. Meaning the co-defendant. The other guy pled. He says he's going to be a witness. He's going to nail him. He's going to tell him everything they did together. So it's an open and shut case. This is a conversation going on between the prosecutor and the defendants sitting over here. He's going to trial, meaning the defendant. He's not going to break that pattern. He has a review of the criminal history and he's suggesting that based on the defendant's pattern and history of taking cases to trial, that's what he's going to do in this case. You know, counsel, I don't mean to interrupt you, but I mean, this is a breathtakingly bad transcript from my perspective of what the trial judge said. You know, I've been a judge for 30 years. I've never seen anything like this. I think the question, given what I find the astonishing comments of the trial judge in this case, we have to look at the time frame involved. And what I'd like you to do, because I think we're all aware of all the really intemperate remarks that the trial judge made in this case. Mr. Rankin said he wanted to go to trial even after the court made its comments at the December 5th hearing. Does that suggest that the court's comments had less of an effect on him and his decision in this case about whether to plead guilty? Tell us the impact of the court's remarks and the timing in this case. Yes, Your Honor. And to follow up, to add to Judge Keenan's question, because I understand that he actually pled guilty three months later. Does that have any effect? So, yes, Your Honor, I understand the question. Yes, ma'am, I understand the question. And I don't think it does, because this is a cumulative effect. So he goes on to say some additional things, which clearly you're aware of. And then the conversation really should be more of, and I say that with all due humility and understanding that Judge Papola knows more about this than I ever will, but the conversation probably should have been about do you want an attorney or do you want to represent yourself. But even after this conversation with the prosecutor, the court then turns to Mr. Rankin, this is again on that first day, and says, I'll advise you that everything I've said in the past 15 minutes you should take into account. I meant what I said. I'm not going to repeat it, is what he's saying to him. He says that to him. So he's saying to him, I'm not going to go over this again. And he's saying to him, what I'm saying to you is important. Now, this is a guy who's walking into a federal courtroom with 30-foot ceilings, giant room, judges sitting up here, people arrive an hour early. Federal judges are not in the habit of repeating themselves in general. Everybody knows it's a big deal and that what he's, he means what he says. But here he is saying it, under those circumstances, he's bolding it, he's highlighting it, he's amplifying it. Well, he's even telling him he's going to get life in prison if he goes to trial. Right. So to later argue that that had no effect because he didn't, he didn't give in, cave, acquiesce for three months, I don't think is reasonable. Because it's not like he's filed that away somewhere and he's just, it's not like there was ever any kind of curing instruction by the court to say, okay, in the last, we got off the rails, but I want you to understand this is your decision. This is a decision that you can make. This is a decision that you need to discuss with your lawyer. You need to come up with it. There's a typical Rule 11 type analysis, is this plea voluntary. But what happens here in this first hearing is inescapable. The judge in front of the defense, defendant and his lawyer, says he requests evidence, you know, let me confirm that I know what happened. He receives evidence. He analyzes evidence. He gives an opinion about the strength of the evidence, the sufficiency of the evidence, the probability of success at trial. He gives an opinion about guilt versus innocence. Then he performs a guideline or sentencing analysis. The statutory max here is 25 years, by the way. He says, you'll get life, let me see, I'll make sure, yes, you'll get life. He could not have actually gotten life. It was a 25 year max. He says, just like this other guy did, who the judge tried before, he got life. So to come back later and say, well, because he didn't give in on that day, he held out for three months, is not, I think, reasonable under the circumstances. And you also have to consider the circumstances with which Mr. Rankin is presented on that day. He has significant health problems. The record goes into that a little bit. But there's no real escape in the fact that he does have significant health problems. He has significant mental health problems, including some of which stem from being sexually assaulted as a child. He's indicated that he can't communicate and has not communicated with his lawyer, whether that's of his doing or someone else's. He has not had communication with his lawyer. He wants a new lawyer. He has a 67 IQ. And then the judge comes in and has this conversation. And it's not that I've been in front of Judge Boyle for 20 years. And I don't think, I mean, good king, bad king, good king. I don't think that's debatable. I think that the judge is actually seeing this and is trying to help this guy in a quick fashion to say, this is what's best for you. But that's exactly what was going on in the Sanya case. The Sanya case seemed to focus more on the benefits of pleading guilty versus here, the judge is focusing more on the detriments of pleading not guilty. And in Bradley, it says, regardless of the judge's objectivity, it is the defendant's perception of the judge that will determine whether the defendant will feel coerced to enter to plead. And so at this first hearing, the judge, I'm sorry, the defendant, he maintains, I'm going to plead not guilty, I'm going to plead not guilty. At the second hearing, he sort of takes a modified approach. I'm not sure whether I'm going to plead guilty or not guilty. At the third hearing, he comes back and he pleads guilty. So these statements, under the circumstances, the number of them, they're not a single brief remark, it's not a single statement or brief remark, they're not made after, they're made before, and they have a cumulative effect. So that when he comes to that second hearing, he is remembering and taking into account all the things that have been said to him before that. When he comes into the third hearing and he's signed the plea agreement, he knows when he signs that plea agreement that the judge has said, it's an open and shut case, it's an easy case. You know, they found you, I mean, they had pictures, no, but they're wearing masks, but they found you five minutes away and eight miles away and that. He knows the judge has said, yeah, meaning, in my mind, that's all I need to know. You're guilty and it's a slam dunk. And that's more or less what the judge says through this process. And so when he gets to that arraignment and he enters the case, that's what the judge thinks of the case and that's what the judge appears to be advocating for. Although I doubt very seriously that Judge Boyle was trying to, it appeared whether he entered a plea or not. Judge Boyle could have tried the case without, you know, but that's what Mr. Rankins is looking at. That's the lens through which he is looking at it. And I'll be happy to answer any other questions you have about that particular issue. The next issue is whether the government breached the plea agreement by presenting argument and evidence relating to a vulnerable victim. And in the plea agreement, there is a paragraph that's a provision that says that no enhancement for vulnerable victim is warranted. And so then during the sentencing phase, the prosecutor, Mr. Bradsher, says when it comes time to talk about the victims, maybe victim impact, that kind of thing, he says there are no witnesses here today. He's talking about victims. But he says, I do have a photograph that I want to present. The teller of the bank. Your Honor, he, not that his physical condition had anything to do with the fact that he was selected for robbery, but he was a person who suffers from polio. And he hands up a picture and it's a picture of a person in a wheelchair and it's a picture of a person who's in a, who has polio. And so, now this is a bank robbery. So it's the only picture that was handed up throughout the whole sentencing. So the, and this is a trial, this is, Frank Bradsher is a prosecutor, fantastic trial lawyer. So he's handing this photograph up to the judge. He could have handed up a picture of the bank, of the car, of a weapon, of money, of a layout of the bank, a map of the town to show where, you know, the only picture he hands up and the only thing that he says with regard to this, it highlights this one particular person who is clearly in a wheelchair and is clearly a victim. And the, these agreements with, so even though he didn't advocate for the application of the guideline provision related to vulnerable victims, what he did do was show the court a picture that establishes a vulnerable victim and then argues for a greater sentence based on a departure or a variance. And so he circumvents that agreement. And the point of those agreements, they need to be, the judge, judges don't have to abide by them. Federal District Court judges don't have to honor those agreements. So it's important that at least the parties honor the agreements, not only in their literal terms but also in the spirit of those agreements. And to do that was a violation of that agreement. In the Second Circuit it says that where the government commentary reasonably appears to influence the sentencing court in a matter incompatible with the agreement, we will not hesitate to find a breach, notwithstanding the formal language. And then in the Eastern District of Virginia, United States v. Ellamine, when the U.S., United States and the defendant stipulate in the plea agreement that a particular factor is appropriate, the parties may breach that agreement when they attempt to subvert that stipulation through action and advocacy. So that's the point here is that the introduction of that evidence through the picture and through the argument by the attorney attempts to circumvent that agreement. And I see that my time is almost up, so I'll be happy to answer any questions. Thank you so much. Thank you, Your Honor. Ms. Fritz. May it please the Court, Christine Fritz on behalf of the United States, asking that you and I want to begin by saying I'm not here to defend what the Court said. What the Court said was not appropriate. It was an expression of his frustration. It shouldn't have happened. But that doesn't make it a reversible error. There are certain things that are very compelling about this case that show that these statements did not affect the defendant's substantial rights. There are certain things, Ms. Fritz, just so bad that the Court can't countenance it. For a judge to sit there and tell somebody that he's guilty, it's an open-shut case, you're going to get life. I mean, it's just breathtakingly bad. And how do we sit there, sit here, seeing something that is as bad as I've ever seen in my legal career, and say, well, it didn't really affect things. Isn't there a point at which, I mean, I'm from Virginia, so I guess you know, this judge would be off the bench for these remarks in Virginia. I guess in the federal system, it's a lot harder to get people off the bench. But how can we just sit here and say, not a big deal, or say it didn't affect the outcome? Doesn't the integrity of the system count for something? If I could, I think I have multiple points to make. And I understand you're not countenancing the behavior, but what I'm saying is about us. How can we sit here and act as if this is a routine case in which the Court may have made a few remarks that the Court should not have made in an ideal situation, expressing frustration. This Court told the guy he was guilty. He said he was a pharmacological black hole. I mean, he loaded on to this person in a way that to me is just shocking and suggests that there was no justice or could be no justice in that courtroom. So how do we then, irrespective of your arguments on the effect on this man, how do we as a court put a stamp of the Court system on appeal saying that this decision can be affirmed? First, I think that this Court could express its views and its significant concerns in an opinion. And say, not a problem, though. I think that it could express those views and share your thoughts, but then go on to apply the test and the case law that has been developed, making clear that this Court is not in the least bit pleased with what occurred here. I don't understand. I guess then I'll be quiet, because you know my point of view. Why would the government even want to take a position in this case to put the stamp of approval on the conviction by the Court Circuit? Why would the government even want to do that? I don't get it. There are a couple of reasons why we believe that the conviction should be upheld. First, the defendant did plead guilty, and he did so three months and 20 days after these statements were made. And during that hearing, there were no inappropriate remarks. The defendant was under oath. He represented that he was doing this of his own free will. He shared that he was now satisfied with the relationship he had with counsel. And the change in the relationship this defendant had with counsel I think is one of the most profound things in this case, because from the beginning, this defendant was unwilling to work within the system. He was unwilling and not interested in following the process. He absolutely refused to speak with his second court-appointed attorney at first. The court-appointed attorney even arranged a video conference, and the defendant did not acknowledge that he was on the video. But that changes, and that changes between late January and mid-February. There was a hearing on yet another motion to have the attorney removed on January 27th. That was denied. On February 19th, defense counsel passed a motion, and this is Docket Entry 119. It's not in the Joint Appendix. And what the defense attorney says there, and I'm quoting this, undersigned counsel is pleased to report that open communication with the defendant has drastically improved in the weeks since the last court appearance. As a result of this renewed dialogue, undersigned counsel has reestablished a meaningful relationship with the defendant. Undersigned counsel, at the defendant's request, has undertaken substantive plea negotiations with the government. The plea negotiation is ongoing. Even should plea negotiation ultimately break down, undersigned counsel is also in the midst of negotiation with the government regarding potential stipulations that would significantly streamline the defendant's trial if necessary. What we have here is a defendant who is now engaging in his case. He's engaging with his attorney, and that's a significant change. He's actually received and discussed plea opportunities. He has gone over the evidence. He is receiving advice from somebody familiar in the law who is advocating for him. And also important is the fact that even in February 19th, when this motion to continue trial is filed, they're still exploring both options. They're exploring plea, and they're also exploring trial stipulations. And that's something that you see looking back even farther, because in early February of 2015, the defendant files two pro se motions, the first of which was to represent himself because he was dissatisfied with counsel, and the other one was he wanted appointment of an expert to help prepare himself for trial. So what we know from this record is yes, there were statements on December 5th that should not have occurred. But we have a defendant who at the end of that first hearing, he says, I'm not interested in pleading. I'm going to trial, and I don't want this attorney. We come back, and I would point out that December 5th hearing was never intended to be an arraignment hearing. It was scheduled to be a motions hearing on his pro se filing that he did not want this attorney. So they come back on December 18th, and that was set up to be an arraignment hearing. And at that time, at the beginning of that hearing, the defendant is still saying, I don't know what I want to do. I haven't decided. I haven't talked with my attorney about this. I still don't want that attorney, and I don't want to talk with him about this. He's not a defendant to be pushed around. He's standing up for himself. And I appreciate that a defendant shouldn't have to do that, but what Sanya and Davia teach is that you look at the particular facts and circumstances of each case. This is the defendant who was confident in his position, and he remained committed to going to trial, at least through his filing of the motion to represent himself in February. And then when this meaningful relationship finally develops with counsel, they're still exploring their options. I would also point out that this plea agreement did contain favorable stipulations. He did receive benefits from the plea agreement. There wasn't an enhancement sought for restraint of victim. He cabined the potential loss. We agreed to recommend acceptance of responsibility, even though whether he timely communicated his desires is questionable. But we agreed. We're willing to give that up. We're willing to allow him to accept his responsibility. This is a benefit. And we also made a stipulation on the vulnerable victim. So, which I'll... Let's talk about that a minute. Absolutely. I absolutely missed this in the record. I didn't realize that they handed up a photograph. And it's true in a long colloquy, there was only one line said about somebody who was in a wheelchair in the bank. And obviously you didn't ask for the email. But what do you do when he hands up that photograph? And why did he do it? I have... First, we attached a photocopy of the photograph that was handed up. The original photo... To our brief. The original photo was actually introduced into evidence. And I was unable to get a better quality copy. I don't know where the statements about being in a wheelchair are made. I'm not aware that this individual was in a wheelchair. And the photograph that I have does not depict him in a wheelchair. What that photograph depicts, it's an image from the bank surveillance system. And the reason that defense... The reason that government counsel provided that is because it shows this terror. It shows the office. And then there's a female teller. And then Mr. G, the teller who has polio. And they're cowering behind a desk in fright. And that's why that was offered. And it was part of government counsel's broader argument that this defendant was dangerous. And he was willing to terrorize and frighten people. He'd done it before. He continued to do it. He did an armed robbery of the Financial... I believe it was Financial Times. And in that situation, there were individuals who were duct taped. He had a real firearm at that time. He spends a significant time in custody. Over a decade, I believe. I have to do with Judge Flores' question to you about the wheelchair. I mean, you clearly put it in because you want to. This is not to insinuate or to sort of put note to the fact that this was a vulnerable victim. Did you mention that he had polio? There was a reference about polio. They mentioned that he had polio. Yes, they did. Was there a photograph showing him in a wheelchair? I am not aware of that. Do you know the record? The photograph that I'm aware of does not show him in a wheelchair. What does it show him? It shows him and another bank teller, and they're cowering behind a desk. And that is also consistent with government counsel's explanation of what it shows. That it shows them cowering in fear. And I also think this goes to the government didn't agree that polio was a forbidden word. The government agreed that an enhancement for vulnerable victim was not appropriate. And a vulnerable victim enhancement applies when a defendant targets somebody because of a disability or other condition. And the notion is that somebody who is going to exploit another person's particular weaknesses is more culpable than somebody else. Here, we didn't say he knew about this polio and he exploited it. We agreed that that wasn't the case. But we didn't agree that the characteristics and experiences of the victims were off limit. Here, we didn't seek to increase the offense level based upon targeting of a teller because of polio. We didn't criticize the plea agreement or express doubt about the propriety of that particular statement. We didn't suggest that he targeted that teller because of polio. In fact, whenever there's a reference to the polio, government counsel, he appreciated that there had been a stipulation and he said, I'm not saying that he was targeted because of this. That's what vulnerable victim is about. I know what it's about. The question is, what was polio about in the case? It was referenced as part of this. It was just referenced as part of the facts and circumstances of the case in the context of describing this photograph of the bank teller who had the firearm pointed at him. I'm sorry, the air pistol. But how did it come up that he had polio? Why would that even come up? Government counsel mentioned it. I know who mentioned it. How did it come up? Why was it relevant to anything? There's no answer, is there? I don't think that polio was off limits. What do you mean polio wasn't off limits? My question is, why was it relevant at all in this case for the sentencing at all? It was just part of. It was not, was it? It was not necessary to point that out. It wasn't even relevant. Not necessary. It wasn't relevant at all, was it? I'd hesitate to say that. You hesitate to answer my question? Well, I hesitate to say that a victim's physical condition is irrelevant to assessing the facts and circumstances of the case. This was a bank robbery, wasn't it? Yes. And everybody who's robbed in a bank robbery, they have incredible fear. I mean, whether they crouch down or not. I mean, I don't think it takes a rocket scientist to believe that. Absolutely, you're terrified. But what does the polio add to it? Some of the individuals who were there were so terrified that they ran out of the building. But this man couldn't run. That's the point, could he? And that's why polio was relevant. It makes him more vulnerable. It does make him more vulnerable. But the fact that he is vulnerable is not the only component of the stipulation. To do a vulnerable victim enhancement, you have to exploit that. The defendant has to know about it and exploit it. And I don't think that we presented any argument or suggestion that he was more culpable because he exploited this teller's polio. Let's get back to the you did a great job. You told us what the relationship has gotten better and all those things. I don't know how you could suggest that, but you did. You said it because now the government is reading the mind of the lawyer and his client based on what the lawyer is saying in open court. But where is the evidence that the incredible taint that was clearly on the record dissipated? Where is the evidence that it dissipated? Over that three months and 20 days. That requires an assessment of the totality of the circumstances. Should that be your burden in this case? Absolutely not. Why not? Because it's plain error. It's the defendant's burden. That's about as plain as it can be, isn't it, in terms of what was said? You said you're going to get life in prison with such an incredible statement. Wouldn't it be in a sense that you'd have to show some rather somewhat clear evidence that it was abated or somehow dissipated, that threat? For example, did the court ever say, well, you know, a couple of months ago I did say this, but, you know, since you're pleading whatever, you know I'm going to be fair to you. Was that ever said? Not to my knowledge. Was that ever said? I didn't mean to say that. I really would wait to see whether or not you're guilty or what the proper sentence is. Was that ever said? I don't believe so. So what is the evidence that it was ever dissipated? What we have is looking at all of the circumstances. We have the passage of time. The time, but what you have is what you face is that he's still fighting his own lawyer. He's in the midst of trying to, you know, communication and that. Okay, they may be getting better, but time alone do you think would do it? How long do you think you would remember that the judge told you you're going to get life if you go to trial? Do you think three months you wouldn't remember it? I mean, come on, common sense. Do you think that if you're standing before a court, a federal court, when you see it scotched on a Supreme Court, equal justice under the law, and you come in and you're told that you go to court, you go to trial, you're going to be found guilty and you're going to get life, do you think in three months and 20 days you'll forget what the court told you? I mean, common sense. We can't be just throw cards. I know you represent the government, but do you think you would forget that? I don't think you would forget that. But I do, again, I think you need to consider all of the circumstances and the character of this defendant. He wasn't one to get pushed around. As a matter of fact, he's one that normally went to trial. Because did the court say, I know he's going to follow his usual pattern? But he didn't follow his usual pattern. Doesn't that cut against you? I don't believe it does. And, again, I am not suggesting that the statements are appropriate, but when you look at the statements and the context of those statements, it is different from other cases that this court has considered. This wasn't an arraignment hearing. There were no ongoing plea talks. There was no suggestion of a better outcome if he pleads as opposed to going to trial. And, again, you have the defendants. There was no suggestion of a better outcome if he pleads. Did you just say that? As I looked at these. You said there was no suggestion that there was a better outcome if he pleads than going to trial. And you're told if you go to trial, you get life. This wasn't a capital offense, was it? No, and that was incorrect advice. But when you look at some of the other cases that have been presented to this court, you know, Bradley, Sanya, Braxton, what they would say in some of those cases, what the court would say, for example, is a plea will stand your client better. A global resolution makes an awful lot of sense. You're only hurting yourself if you go to trial. It would be better to get this wrapped up in one situation because if we present two separate criminal cases, your sentence will be less favorable. I mean, there were actual very specific statements that the judge was making. In other cases, the judge is making very specific statements to the defendant saying, you will have a better outcome if you go to trial. I think you should go to trial. In Bradley, the court was saddened that they didn't take the plea agreement. And in these cases also, you have a very close temporal relationship. In Bradley, it's the second morning of trial and the third week of trial. It was the lengthy trial when these comments were made. In Sanya, the statement was made five days later there was a plea agreement, and it was set for Rule 11 the next month. Wilson was a longer time, but the problem with that was that there was not a Rule 11. In any of those cases that you're relying on, did the trial judge say, as he did in this case, he's obstructing and malingering and doing everything within his ability to frustrate the criminal process? Today, we're again trying to have a mender of plea of guilty to the charge. His resistance is manipulative. He engages in a persistent charade. And I use these words carefully and literally. Did any of those cases involve language like that? Your Honor, I see that my time is up. May I respond? I think you can answer that yes or no. No, there weren't cases like that, but there was certainly strong language in other cases. No one is going to let you testify because you're an armed robber. That's your career. These three guys, your allies, are going to line up to get Rule 35s to get out of jail, and they're going to testify against you, and you're going to be hung out for whatever it is, a hundred-year sentence. There are statements, and then that goes on in that particular case, that if you go to trial, you're going to be gone forever. What is your problem? Don't you realize how serious this is? Why aren't you pleading? I mean, those are situations where the court is specifically offering its opinion that pleading guilty will get you a more favorable outcome, explicitly saying as much. And again, I'm not defending the court statements, but we do think that the conviction is sound, and we ask that you affirm the conviction and the sentence. Thank you, Carol. Speaks, you have a few minutes. First, I'd like to say that after reviewing the record, I do not think that there is a mention of a wheelchair. I apologize. I apologize to you as well. I think that was an inaccurate statement on my part and inexcusable, and I apologize. I do think that the point is there, that he says he brings up polio, and he gave a recitation of these exact same facts at the entry of the plea, and nowhere in those facts he gives a very detailed account of what happened. Nowhere in there does he say anything about polio, and I do think that that presents an issue, whether there's a wheelchair or not. The picture that's been in the custody of the government is not clear, but it's clear in conjunction with the statement that he is identifying a person who is vulnerable, and he does it in the context of describing victims. And then in terms of the open communication and the plea negotiation and the relationship improving, if we look at it from the defendant's point of view, and I think that's what the case law would suggest, I would ask you to ask yourselves who is changing in this whole process. The judge isn't changing. The defense lawyer isn't changing. The United States attorney isn't changing. The only changing that's going to this relationship is the defendant is acquiescing to a system that is all bearing down on him to say that you're guilty, you know you're guilty, and we know you're guilty. And so then one of the things that you discussed just a moment ago was the idea that no suggestion of a better outcome if he pleads or goes to trial. And I do think that's what this whole case comes down to. Is there a suggestion of one of the things that it comes down to, of a better outcome if he pleads or goes to trial? And, again, in Sanya, the idea was I think you're going to do better. Here the implication, and not even really the implication, is that you're going to go to trial, you're going to lose, and when you lose, you're going to get life, just like this other guy. And that is the, combined with the position of the court, the force and magistry of the court's opinion, combined with the authoritative statements that listen to what I'm saying, what I'm saying to you is important, and that combination of facts says to a defendant it's going to get worse if you, it's going to be a lot worse on you if you don't accept his plea. And I am defending the court to some extent because I understand the difficulty of dealing with that issue of a person who wants another lawyer and then another lawyer. I have been in that situation, and I think many people at the trial level have been in that situation on a regular basis, and I understand that it's difficult to balance those competing interests. But I feel like the substance of that discussion maybe should have been around the relationship between the lawyer and not to step into the lawyer's shoes and to say this is in your best interest to enter this plea of guilty. I think when the judge does that, regardless of intent, which I think is nothing but constructive and positive, regardless of his intent, it violates the rule and the case law, and that requires a reversal. Thank you. All right. Thank you very much. We'll come down. We'll come down to Greek Council and proceed to our final case.
judges: Roger L. Gregory, Barbara Milano Keenan, Henry F. Floyd